UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:15-cr-91-TRM-SKL |
| | ) | |
| RAY FOSTER, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Before the Court is a motion to suppress filed by Defendant Ray Foster ("Defendant") [Doc. 139].[1] In the motion, Defendant argues for suppression of statements he made to law enforcement officers on three separate occasions because his Fifth and Sixth Amendment rights and *Miranda v. Arizona*, 384 U.S. 436, 479 (1966) were violated. Plaintiff United States of America ("the Government") filed a response in opposition to the motion arguing suppression is not warranted because no constitutional or *Miranda* violation occurred [Doc. 155]. At the hearing, Defendant orally modified his motion to seek suppression of the evidence found during a warrantless search of his residence because his consent was not knowing and voluntary and, even if it was, the search exceeded the scope of his consent when the camper and truck parked at

---

[1] The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b) by standing order. An evidentiary hearing on the motion to suppress originally scheduled for April 18, 2016, was delayed pending the mental evaluation of Defendant pursuant to 18 U.S.C. §§ 4241, 4242, and 4247 [Docs. 175 & 184]. After Defendant was held to be competent on August 30, 2016 [Doc. 314], a hearing on the motion to suppress was held September 13, 2016.

his residence were searched.[2]   The parties submitted post-hearing briefs [Docs. 330 & 332] and this matter is now ripe.   For the reasons stated below, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

## I.   FACTS

The motion involves three statements provided by Defendant and a warrantless search of Defendant's premises during which law enforcement officers recovered methamphetamine and other evidence from Defendant's parked camper and truck.   The first statement and the search took place on July 31, 2014.   The second statement was provided at a public restaurant over six months later on February 5, 2015.   The final statement was provided more than six months later on September 9, 2015, the day Defendant was arrested on the indictment in this case.

During the evidentiary hearing held September 13, 2016, the Government offered the testimony of Tennessee Bureau of Investigation ("TBI") Special Agent Bryan Freeman. Defendant offered the testimony of the State of Tennessee 10th Judicial Drug Task Force ("DTF") Officer Clay Moore.   Defendant also testified.

### A.  Officers' Testimony

Agent Freeman detailed his extensive law enforcement experience and training, described his typical style of interrogation with open-ended questions asked in a civil and subdued manner, and explained that, based on the thousands of interviews he has conducted and his familiarity with witnesses who are incapacitated by or under the influence of illegal drugs, he would not begin or would stop an interview if he thought a witness was high on drugs and incapable of making a knowing, intelligent, and voluntary statement.   Agent Freeman discussed typical physical and

---

[2]  Another potential oral addition to the motion about his two post-arraignment proffered statements was resolved by agreement when the Government represented it would not seek to use Defendant's proffered statements in its case-in-chief.

verbal "tells" of drug intoxication such as falling down, slurring words, nonresponsive answers, incoherent thought patterns, and the like. Agent Freeman testified that in all three interviews at issue, Defendant did not exhibit these tells. To the contrary, Defendant was engaged and expressed coherent thoughts and sentences, he did not fall, trip, or slur his words, and his responses "tracked," meaning they made sense based on information Agent Freeman was already aware of from his investigation. Agent Freeman thought Defendant's responses were not always truthful, but that they were internally consistent and, because they comported with information gained from other aspects of the investigation, were also externally consistent. Defendant was known to Agent Freeman because he had interacted with Defendant in another investigation in 2006 or 2007.

### 1. The July 31, 2014 Statement and Search

Agent Freeman and Officer Moore testified regarding the circumstances of Defendant's first statement and the search of Defendant's property. Based on information law enforcement developed regarding Defendant's involvement in methamphetamine activities, a decision was made to attempt both a consensual interview of Defendant and a consensual search of his premises. On July 31, 2014, Agent Freeman, Officer Moore, and Defendant's Tennessee Department of Corrections Probation Officer, Bill Robinson, went to Defendant's residence to seek Defendant's consent for a search and interview. Both Agent Freeman and Officer Moore knew Defendant was subject to a search without a warrant based on his conditions of parole. Officer Robinson was present in case Defendant refused consent and it was necessary to conduct a "parole search." For strategic reasons, however, the officers planned to obtain consent if Defendant was willing so the process would be more civil and because Agent Freeman believed Defendant would be more likely to cooperate in the ongoing investigation if the search and interview were consensual.

Upon arrival, Defendant and two other men were in or near a work shed. Defendant

approached Agent Freeman and Officer Moore in the driveway. While Officer Robinson was visible to Defendant, he stood back and did not participate in asking Defendant for consent to search, did not interview Defendant, and did not participate in the search. Officer Robinson left before the search was concluded. Agent Freeman explained to Defendant that he was suspected of methamphetamine activities. Defendant said he was expecting law enforcement to come as he was aware there were certain individuals talking to law enforcement about his involvement with methamphetamine.

Agent Freeman asked for consent to search for methamphetamine and drug activities and Defendant was advised of his *Miranda* rights. Agent Freeman testified he did not tell Defendant that he had to consent under the terms of his parole or because Officer Robinson was present. Standard forms informing Defendant of his constitutional rights and waiving those rights were read aloud to Defendant by Officer Moore and then given to Defendant to review on his own. Defendant gave consent for the search and interview and signed and dated the consent forms on July 31 prior to the initiation of any search or interview.[3] When asked for his consent and during the course of the interview, Defendant was never handcuffed or restrained, guns were never drawn, and yelling or threats never occurred.

After the forms were signed, other agents arrived to help with the search. In all, about eight agents participated in the search, including Officer Moore and DTF Officer Bill Cherry. The search lasted about four hours and, at times, Agent Freeman participated in the search. Defendant's girlfriend and infant were in the house during the search. Agent Freeman never heard anyone threaten to call the Tennessee Department of Children's Services ("DCS") to remove the infant. Agent Freeman does not know who asked about and turned off the camera

[3] The executed forms dated July 31, 2014 are Government's Exhibits 1 and 2.

surveillance system in Defendant's house and the system was not seized. Agent Freeman testified that Defendant moved about the property during the search cooperatively talking to various officers. Defendant was mostly outside the house during the search and interview. Agent Freeman did not prohibit Defendant from entering the house or tell him to stay outside. Agent Freeman also said Defendant was "let in" the house toward the end of the search.

Officer Moore said he searched areas that were outside of the "residence," but on the property including the camper, truck, and a detached garage. Officer Moore testified the whole property could be searched according to the terms of Defendant's parole agreement. He also said a large amount of methamphetamine[4] was found in the camper toward the end of the search and several cell phones were found in the truck. On cross-examination, Officer Moore testified that he did not obtain consent from Defendant to search the truck and the camper. On redirect examination, Officer Moore said the search form authorized a complete search of the premises and that the reference to "residence" on the form includes the Defendant's entire property and is not limited to his house.

Agent Freeman interrogated Defendant outside Defendant's residence on the day of the search.[5] Defendant said he had methamphetamine in a pipe, but he did not say he had just smoked methamphetamine. Agent Freeman agreed that since Defendant confessed he had methamphetamine in a pipe, it was reasonable to assume Defendant either had recently used methamphetamine or intended to use it. Agent Freeman was not aware whether Defendant had been awake for two weeks as Defendant now claims. Agent Freeman was aware Defendant was a methamphetamine addict, meaning he used the drug often. Agent Freeman did not notice typical

---

[4] In total between 18 and 19 grams of methamphetamine was seized.

[5] Agent Freeman prepared an Investigative Report of the interview, which was entered as Government's Exhibit 3.

addict or "high" behavior from Defendant, such as being animated, hyperactive, aggressive, paranoid, or talkative at any of the interviews. Instead, Defendant was cooperative and at times walked along with the officers as they searched various areas.

Agent Freeman concluded that Defendant was not being fully candid and cooperative in the July 31 interview. At the conclusion of the interview, however, Defendant was not arrested because Agent Freeman hoped Defendant would cooperate in the ongoing conspiracy investigation. Agent Freeman told Defendant the investigation was continuing and he requested Defendant's cooperation with the ongoing investigation. Agent Freeman left his business card and phone number with Defendant so Defendant could contact Agent Freeman if he decided to cooperate.

Between the first statement on July 31, 2014 and the second statement on February 5, 2015, Defendant initiated contact with Agent Freeman a few times to again claim he was merely an addict and to ask about the status of the investigation. Agent Freeman did not believe Defendant was ready to cooperate fully because Defendant was hesitant and claimed involvement only as a drug user, which Agent Freeman did not believe.

## 2. The February 5, 2015 Statement

A few days prior to February 5, 2015, Defendant sent a text message to Agent Freeman to initiate contact. In a subsequent phone call, Defendant indicated he was ready to cooperate and they agreed to meet. Agent Freeman recalled that during this time frame, Defendant raised an issue about a truck seizure notice he received from DTF authorities. Defendant was concerned about his truck, which had not been physically seized the day of the search, although about $2,000 cash was seized. Agent Freeman denied any involvement with or prior knowledge of the issuance of the truck seizure notice and he denied causing any seizure notice to issue as a

means to encourage Defendant to cooperate.

Agent Freeman wanted to meet away from Defendant's hometown so Defendant would not be seen talking to the police since he anticipated Defendant would cooperate with the ongoing investigation. At Defendant's suggestion that they meet at a particular bar or O'Charley's Restaurant, the meeting was set for February 5, 2015 at the public restaurant. Defendant drove himself to the restaurant and met with Agent Freeman and another TBI agent. The agents were sitting across from each other in a booth eating appetizers and drinking nonalcoholic beverages when Defendant arrived. Defendant pulled up a chair to sit at the end of the booth table.

During the ensuing interview, Defendant was not handcuffed, guns were not drawn, there was no yelling or threats made, and Defendant's movement was not restricted. Agent Freeman noticed no strange or outrageous behavior by Defendant or any indication he was intoxicated, high, or had been awake for days. Defendant appeared calm, subdued, congenial, and cooperative. Because it was not a custodial interrogation, Defendant was not advised of his *Miranda* rights. The agents offered to purchase food for Defendant, but instead Defendant ordered two glasses of beer. During the interview, Defendant made statements about his knowledge of illegal drug activity.[6] Agent Freeman believed Defendant was being more cooperative because he was more truthful than his prior interview, provided more distribution information, and was no longer claiming to be just a drug user or addict.

The men left the restaurant together after Agent Freeman paid the bill. They walked to Defendant's truck together and Defendant said he wanted to cooperate and he gave Agent Freeman the phone number of a person they had discussed during the interview from his cell

---

[6] Agent Freeman prepared an Investigative Report of the interview, which was entered as Government's Exhibit 4.

phone. Defendant was not arrested; instead, he left the restaurant driving his own truck. Agent Freeman said he would not have let Defendant drive if he thought Defendant was intoxicated or in any way impaired or unable to safely drive. Agent Freeman denied being aware of Defendant's claim that he ran off the road damaging his truck later that day due to impairment.

Between February 5 and September 9, 2015, Agent Freeman met with Defendant a few more times to further the investigation. During one of the meetings in April, Defendant made a controlled call to another target of the investigation. Again, Agent Freeman observed only normal behavior from Defendant during these contacts, although Defendant was understandably a little nervous about engaging in active cooperation.

### 3. The September 9, 2015 Statement

On August 25, 2015, an indictment was returned against Defendant and several alleged co-conspirators [Doc. 1].[7] On the morning of September 9, 2015, Defendant was arrested at his home. Later that same morning, Agent Freeman and Officer Cherry conducted a post-arrest interview of Defendant at the McMinn County Sheriff's Office. Agent Freeman orally advised Defendant of his *Miranda* rights and presented a standardized rights waiver form to Defendant and Defendant waived his rights and signed the form.[8] Defendant allegedly again made several incriminating statements during this post-arrest interview.

During this interview, Agent Freeman again noticed no strange or extreme behavior by

---

[7] In two counts of the 32-count indictment, Defendant is charged with conspiracy to distribute and possess with intent to distribute a large quantity of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 and with distribution of a methamphetamine mixture on or about July 31, 2014 in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) [Doc. 1 at Page ID # 1-14, ¶¶ 1, 13].

[8] Government's Exhibit 5 is the executed form. Again, Agent Freeman prepared an Investigative Report of the interview, which was entered as Government's Exhibit 6.

Defendant or any other indication Defendant was incapable of voluntary consent or confession because he was intoxicated, high, or had been awake for days. Instead, Defendant appeared congenial and cooperative and his answers were responsive and normal. At some point, Agent Freeman became aware that a drug test conducted on Defendant that day by a pretrial services officer was positive for methamphetamine and cocaine, but he does not recall knowing this during the interview. Agent Freeman does not know when Defendant fell asleep after the interview.

**B. Defendant's Testimony**

Defendant's testimony contradicted a lot of the above testimony, particularly the testimony about his ability to make a knowing and voluntary waiver of his rights during each interview. With respect to each interview, Defendant testified he was high and had been awake for weeks, and was unable to give a voluntary, knowing and intelligent waiver and confession.

Defendant admitted to 20 years' experience with taking methamphetamine and that he used at least an eight-ball of the drug daily during the relevant time period. Defendant testified that due to his vast 20 years of experience using methamphetamine, he was able to talk to people, and run two businesses while consuming the drug. One of the businesses involved selling cars, trucks and equipment to various people and the other was a tire shop. Defendant testified he consumed methamphetamine without "falling apart."

Defendant said he felt pressured to talk to Agent Freeman because he was concerned for his daughter as DCS "is threatened to being called every time the police are involved at [his] house," he was worried about losing his truck, and he was afraid he would go back to prison because he was using drugs while on parole.

Defendant admitted to having several prior felony convictions and to being concerned

about the possible sentence (25-to-30 years) he faces in this case. Defendant stated he has never been involved in the selling or distribution of methamphetamine; he just uses it. Defendant also said all three of his statements were entirely false and that he had made up the information he provided to Agent Freeman so that he could create the appearance of cooperation because of his concerns listed above. Defendant stated he knew none of the information he provide to Agent Freeman could be proven.

### 1. The July 31, 2014 Statement and Search

When the officers arrived at Defendant's residence on July 31, 2014, Defendant started to run from the shed where he was smoking methamphetamine with two other men. Defendant testified he stopped because he realized his girlfriend and infant were in the house. On direct examination he said he signed the consent forms because his parole officer was there and he had a parole contract that required him to submit to parole searches. On cross examination, Defendant testified he could not remember if the agents read the consent form to him and he does not remember signing the form. Defendant said the signature on the form is not his sober signature and also said that the search form was not filled out when he signed it.

Defendant did not speak with his parole officer, but he thought a parole search was being conducted. Defendant also testified that he was told his parole officer was there and that he had to consent to a search, but Defendant did not identify who allegedly told him this. At another point, Defendant indicated no one explained the parole search to him, he just knew that he had signed a parole contract allowing searches.

During the interview, officers first asked Defendant about whether he had guns or drugs, and he told the officers he had a pipe and that he and the other two men present were smoking methamphetamine. He was kept out of his house by both Agent Freeman and Officer Moore who

alternated staying with him. He said he gave a statement to Agent Freeman that day because he was high and did not know what he was doing.

Defendant testified that at the "very end" of the search, he was allowed into the house to talk to his girlfriend. Officer Cherry told him he did not deserve a beautiful baby daughter and that they would call DCS if Defendant did not tell the officers where his wallet and money were located. The DCS threat was made in connection with finding Defendant's money. The officers then "stole" his money by seizing it.

Defendant testified he was high on methamphetamine that day and had been consuming one or two 8-balls of methamphetamine each day for weeks at a time. On July 31, he had been awake for two weeks.

After the officers left, Defendant threw away the business card given to him by Agent Freeman and never contacted him again until he got the seizure notice discussed below. He also said it was possible that he contacted Agent Freeman, but could not remember it because he used methamphetamine "every day of his freedom" except when he was in rehab.

### 2. The February 5, 2015 Statement

When Defendant got a seizure notice for his truck from DTF, he called the number on the notice and was told that he had to talk to Agent Freeman, so he called Agent Freeman after getting his number. A meeting at O'Charley's was arranged to discuss the seizure notice. Defendant could not remember how the meeting at O'Charley's was arranged, but he remembered pulling up a chair and sitting at the end of the booth. He testified he had no fear about being able to leave and was never handcuffed. He was there to talk about his truck, but was willing to talk about the other things also. He admitted giving a phone number to Agent Freeman of a person they discussed when they were in the parking lot, but again said everything he told him was false.

During this interview, Defendant was in the same condition "as always." He had consumed an 8-ball of methamphetamine and was high and had been up for a week. He said he ran off the road and "busted up" his truck later that same day because he was high.

He had some contact with Agent Freeman after the meeting, but his motive in contacting Agent Freeman was to get his "stolen" money back. He denied cooperating, but on cross examination admitted to making a controlled call at the request of Agent Freeman. Defendant said when he made the call he was not in his right mind, but also that the call was about a truck he sold, not any drug conspiracy.

### 3. The September 9, 2015 Statement

On the morning of his arrest, Defendant was again high, had been out all night doing drugs and had been awake for about a week. He was under the influence of methamphetamine and cocaine. He was functioning that day because he has 20 years' experience with taking methamphetamine. However, Defendant reported that he fell asleep in handcuffs while sitting with several codefendants the day of his arrest.

## II. ANALYSIS

Defendant seeks to suppress the incriminating statements he made during his three interrogations because his waiver of rights and confessions were not voluntary, knowing, and intelligent. Defendant also seeks to suppress all evidence located during the search on July 31, 2014, because his consent was not voluntary, knowing, and intelligent and, alternatively, he seeks to suppress the evidence in his camper and truck because the scope of his consent was exceeded.

### A. Applicable Standards

#### 1. Statements

The Fifth Amendment to the United States Constitution provides that a defendant cannot "be compelled in any criminal case to be a witness against himself." *United States v. Protsman*, 74 F. App'x 529, 532 (6th Cir. 2003) (citing U.S. Const. amend. V.). The Sixth Amendment provides "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U. S. Const. amend. VI. In *Miranda*, the Supreme Court upheld a suspect's constitutional right against compelled self-incrimination and established that no criminal suspect may be subjected to custodial interrogation without first being advised of the right to have counsel present and the right to remain silent. 384 U.S. at 478-79. "To ensure compliance with this rule, incriminating statements elicited during custodial interrogation prior to *Miranda* warnings cannot be admitted at trial." *United States v. Malcolm*, 435 F. App'x 417, 420 (6th Cir. 2011).

*Miranda*'s procedural safeguards apply to suspects only if they are subjected to a custodial interrogation, but regardless of whether formal criminal proceedings have begun. *United States v. Ray*, 803 F.3d 244, 266 n.12 (6th Cir. 2015); *see also Hoffner v. Bradshaw*, 622 F.3d 487, 511 (6th Cir. 2010). "A suspect is 'in custody' for *Miranda* purposes if there has been a 'formal arrest or restraint on freedom of movement.'" *Ray*, 803 F.3d at 279 n.12 (quoting *Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977))). The person seeking to suppress evidence bears the initial burden of establishing he was in custody. *United States v. Lawrence*, 1989 WL 153161, at *5 (6th Cir. Dec. 18, 1989); *see also United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some

Case 1:15-cr-00091-TRM-SKL   Document 341   Filed 09/28/16   Page 13 of 27   PageID #: 2101

constitutional or statutory right justifying suppression.") (quoting *United States v. Feldman*, 606 F.2d 673, 679 n.11 (6th Cir. 1979)).

Whether a defendant was in custody for purposes of *Miranda* is a mixed question of fact and law. *See United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003). "To differentiate between custodial and noncustodial encounters, courts consider the totality of the circumstances of the encounter . . . ." *United States v. Conder*, 529 F. App'x 618, 621 (6th Cir. 2013). "[C]ourts focus on the objective circumstances of the interrogation, to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action[.]" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citations and internal quotation marks omitted).

"[P]olice encounters in a person's home typically do 'not rise to the kind of custodial situation that necessitates *Miranda* warnings' because the home 'presumably is the one place where individuals will feel most unrestrained in deciding whether to permit strangers into the house, in moving about once the police are there, in speaking as little or as much as they want, in curbing the scope of the interview or in simply asking the officers to leave.'" *Conder*, 529 F. App'x at 622 (quoting *Panak*, 552 at 465-66). *See also United States v. Gillman*, 432 F. App'x 513, 516 (6th Cir. 2011) ("an in-home encounter between police and a citizen is generally non-custodial."); *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (holding police questioning in the home is "significant" to the custody inquiry because "such a venue generally does not present a coercive environment").

The following factors guide the custody inquiry: (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told he was not required to answer the

questions posed by law enforcement. *See, e.g., United States v. Hinojosa*, 606 F.3d 875, 883 (6th

Cir. 2010). No one factor is determinative. *See, e.g., Conder*, 529 F. App'x at 623 (holding

defendant "overstates the importance of the fact that the agents did not tell him that he could refuse

to answer questions and could terminate the interrogation at will. Although these factors cut in

his favor, this court has never held that such admonitions are a necessary condition of a

noncustodial interrogation.").

If a defendant was subjected to a custodial interrogation, then:

> Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized of the constitutional right against self-incrimination and has validly waived this right. Such a waiver must be made voluntarily and free of any coercion. Similarly, an accused's confession must be made freely, voluntarily and without compulsion or inducement of any sort. The government bears the burden of proving–by a preponderance of the evidence–the voluntariness of both an accused's *Miranda* waiver and confession.

> The test for whether a *Miranda* waiver is voluntary is essentially the same as the test for whether a confession is voluntary. In determining whether a confession is involuntary due to police coercion, this court employs a three-step analysis: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements.

*United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (citations and internal quotation marks

omitted).

Applying this test, the Court "must first determine whether the police activity was

objectively coercive." *Id.*; *see also United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000)

(admitting confession where defendant "failed to advance any evidence of coercive police

activity"); *United States v. Anderson*, 695 F.3d 390, 394 (6th Cir. 2012) ("the waiver must be both the product of a free and deliberate choice rather than intimidation, coercion, or deception and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (internal quotation marks omitted)).

To determine whether a defendant understood and waived his *Miranda* rights, courts examine the totality of the circumstances, including the suspect's age, experience, education, background, and intelligence. *See e.g., Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009); *United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). *See also United States v. Brown*, 443 F. App'x 956, 958 (6th Cir. 2011) (holding the procurement of a valid waiver, "generally produce[s] a virtual ticket of admissibility"); *United States v. Eicher*, No. 90-1717, 1991 WL 29199, at *2 (6th Cir. Mar. 7, 1991) (holding "a waiver may be implied when a suspect answers questions or provides information after being fully informed of his *Miranda* rights"); *United States v. Vaughn*, 496 F.2d 622, 622 (6th Cir. 1974) (holding that "the refusal to sign a written waiver, standing alone, does not render inadmissible statements or evidence voluntarily given after full warnings").

"The Fifth Amendment's protection against compelled self-incrimination, from which *Miranda*'s warning requirement is derived, prevents the government from introducing unwarned statements against a criminal defendant at trial, but it does not apply to physical evidence." *United States v. Reese*, 509 F. App'x. 494, 503 (6th Cir. 2012) (citation omitted). "The *Miranda* rule protects against violations of the Self–Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements." *Id*. at 503

(alteration and internal quotation marks omitted). *See also United States v. Lewis*, 110 F. App'x 569, 572 (6th Cir. 2004) ("The police's failure to issue Lewis a *Miranda* warning thus does not prevent the admission into evidence of the subsequently discovered firearm—the physical, nontestimonial fruit of his voluntary statements.").

### 2. Search

The Fourth Amendment of the United States Constitution guards against unreasonable searches and seizures. U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ."). Perhaps the most significant place protected by the Fourth Amendment is an individual's home. *See Minnesota v. Carter*, 525 U.S. 83, 94 (1998) (Scalia, J., concurring) (noting "a man's home is his castle") (emphasis omitted); *United States v. Nelson*, 459 F.2d 884, 885 (6th Cir. 1972) (same). Thus, a search conducted in a home without a warrant is presumptively unreasonable. *Michigan v. Fisher*, 558 U.S. 45, 47 (2009). This presumption, however, can be overcome in limited circumstances when an exception to the warrant requirement applies. *Id.* One such circumstance is where an individual consents to a search of his home. *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc) ("It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search.") (citations omitted).

An individual can consent in a number of ways, *id.* ("Consent to a search 'may be in the form of words, gesture, or conduct.'") (quoting *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976), but that consent must be given "freely and voluntarily," *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is 'a question of fact to be determined from the totality of all the circumstances.'" *Carter*, 378 F.3d at 587 (quoting *Schneckloth v. Bustamonte*, 412 U.S.

218, 227 (1973)).   The government must show, by a preponderance of the evidence, an individual validly consented, *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010), which requires a showing that an individual's consent was "unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion," *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008) (quoting *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977)).

Even if an individual is found to have validly consented, he can still challenge a search on the basis that it exceeded the scope of his consent.   *See United States v. Canipe*, 569 F.3d 597, 604 (6th Cir. 2009).   As with most Fourth Amendment analysis, the reasonableness touchstone guides the resulting analysis concerning the scope of consent.   *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991).   Specifically, a court reviewing whether officers stayed within the bounds of an objectively reasonable search should ask "what would the typical reasonable person have understood by the exchange between the officer and the suspect?"   *Id.* at 251.

### B. The July 31, 2014 Statement and Search

#### 1. Defendant Was Not in Custody and Was Advised of and Waived his Rights

There is little to no evidence to suggest Defendant was subjected to a *custodial* interview on July 31, 2014.   First, there is no evidence to indicate Defendant was placed under formal arrest. Second, the factors that guide the custody inquiry all point to a noncustodial interview because: (1) Defendant was interviewed at his premises; (2) while the interview took place over the course of four hours, the manner of the questioning was not coercive or unreasonable; (3) there was little, if any, restraint on Defendant's freedom of movement; and (4) Defendant was told both in writing and orally that he was not required to answer the questions posed by law enforcement.   *See, e.g., Hinojosa*, 606 F.3d at 883.   It is unclear whether Defendant is claiming that this first interview was custodial because he could not enter his house when he first wanted to do so.   To the extent he

may be making this claim, it fails under a totality-of-the-circumstances review because Defendant retained the freedom to move about—without handcuffs or other restraints—or leave the premises even if he was kept out of his house for some period of time.

Even if the factors pointed toward a custodial interrogation, however, Defendant's claims regarding his first statement would fail because I **FIND** the officers provided a proper *Miranda* warning and obtained a valid waiver and a knowing and voluntary confession along with Defendant's consent to a search.

### 2. Defendant's Waiver, Consent, and Confession Were Knowing and Voluntary

The issues raised by Defendant regarding the first interview and search that remain are whether his waiver, consent, and confession were knowing and voluntary and, if so, whether the officers exceeded the scope of his consent to search. It is undisputed that Defendant signed the advice of rights and waiver and consent forms. In the forms, which were read aloud to Defendant, he was advised that he had the right to refuse to talk and to refuse consent to search and he acknowledged that his consent to both the search and the interview were voluntarily and without coercion by or promises from law enforcement agents. However, the Court must still consider Defendant's intertwined arguments that police coercion or his intoxication rendered his waiver, consent, and statement involuntary.

I will address Defendant's claim of being too high to make a voluntary waiver, consent, or confession first. "Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989). As the Supreme Court has explained, "[a]bsent police conduct causally related to the confession,

there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986) (indicating that if the defendant's state of mind makes him susceptible to coercion, a lesser degree of coercive conduct may render the confession involuntary, but explaining that "mere examination of the [defendant]'s state of mind can never conclude the due process inquiry.") *id*. at 165. Thus, police do not act coercively by conducting an interview with an intoxicated defendant unless they know of the defendant's weakened mental state and choose to exploit it. See *United States v. Treadwell*, 11 F. App'x 502, 511 (6th Cir. 2001).

While intoxication is a factor in determining the voluntariness of a consent or waiver of rights, a defendant can voluntarily waive his rights or consent even when intoxicated. *See e.g., United States v. Perry*, 703 F.3d 906, 909 (6th Cir. 2013) (intoxication does not necessarily make consent involuntary); *United States v. Montgomery*, 621 F.3d 568, 572-73 (6th Cir. 2010) (citing *United States v. Watters*, 572 F.3d 479, 483 (8th Cir. 2009) ("Factors relevant to the voluntariness of a defendant's consent include whether the defendant was intoxicated, but intoxication alone does not render consent invalid."); *United States v. Scheets*, 188 F.3d 829, 839-40 (7th Cir. 1999) ("The mere fact that an individual is intoxicated does not render consent involuntary. . . . It is simply another factor to be taken in consideration when assessing the totality of the circumstances."); *United States v. Gay*, 774 F.2d 368, 377 (10th Cir. 1985) (holding that defendant "can be too intoxicated to operate a motor vehicle, but rational enough to [consent]").

During the hearing, Defendant boasted of his ability to run businesses, talk to people, and not "fall apart" during his 20 years of extensive methamphetamine abuse. At the same time, he claimed that on each of the three occasions he gave statements to Agent Freeman over the course of some 14 months, he was too high and too sleep deprived to know what he was doing. The

officers' testimony soundly disputes this claim. I **FIND** Defendant's testimony during the hearing was far less credible than the officers. For example, Defendant gave inconsistent testimony about being too high to remember certain details of his interviews, while claiming he was coherent and rational enough to plan and provide false statements that could not be proven. Even in Defendant's own account of the first interview, he was able to accurately observe the presence of his probation officer and understand the potential impact of his parole conditions on the issue of a search. Moreover, Defendant's own testimony indicates he was able to engage in a seemingly rational conversation.

Even if Defendant was high and sleep-deprived at the time of his first confession, in assessing the totality of the circumstances I **FIND** no evidence the officers knew of and took advantage of any significant weakened mental state of Defendant. Agent Freeman described Defendant as cooperative, coherent, and fully able to engage in a logical conversation over several hours. The officers credibly testified they did not threaten Defendant, draw weapons, or use harsh language. Defendant was told that he could refuse to answer questions and refuse to consent to a warrantless search. Defendant was at home. Even by his own account, Defendant acquiesced in answering questions, albeit falsely according to Defendant. I **CONCLUDE** the evidence does not indicate Defendant, a much practiced drug user with vast experience with the criminal justice system, was too intoxicated to make a knowing and voluntary waiver, consent, and confession. "A defendant 'must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police' in order to invalidate consent." *United States v. Elkins,* 300 F.3d 638, 648 (6th Cir. 2002) (quoting *Crowder* 62 F.3d at 787). There is no evidence in the record suggesting any objectively improper action on the part of the officers.

In addition, Defendant provides little support for his claim of coercion. To the extent he is claiming the agents used the threat of a parole violation or arrest to pressure him, it is well established that "custody, or the threat of custody does not automatically invalidate the voluntariness of consent," nor does "fear of arrest." *United States v. Carr,* 187 F. App'x 602, 607 (6th Cir. 2006). *See also United States v. Watson,* 423 U.S. 411, 424 (1976) (holding custody, by itself, does not render consent coerced). Defendant's suggestion that Officer Cherry threatened to call DCS or that he knew DCS could be called does not equal improper action by the officers. Defendant's own testimony indicates that at most DCS was not even mentioned until toward the end of the search and long after his statement, waiver, and consent to search were given.

Finally, Defendant also complains that the officers explicitly or implicitly threatened a parole search. Defendant appears to argue that he did nothing more than submit to a claim of lawful authority because he could have been the subject of a parole search and, thus, he did not give a lawful consent. Consent, however, is not deemed involuntary merely because law enforcement officers suggest they will find another lawful method of searching if a defendant does not consent. *See United States v. Lucas,* 640 F.3d 168, 174 (6th Cir. 2011) (holding an officer's warning that a search warrant would be sought if consent was not granted was a proper statement that did not taint the subsequent search); *United States v. Salvo*, 133 F.3d 943, 954-55 (6th Cir. 1998) (holding it is well-settled that an agent's comment that he would get a search warrant if consent was refused does not invalidate or taint consent).

Even if Defendant was high at the time of this first confession, in assessing the totality of the circumstances, I **FIND** no evidence the officers took advantage of any significant weakened mental state of Defendant or acted coercively. Agent Freeman described Defendant as cooperative, coherent, and fully able to engage in a conversation over several hours. There was

no credible evidence presented to indicate Defendant, a very experienced drug abuser, was impaired beyond the capacity to give valid consent or to make a voluntary statement. The officers credibly testified they did not threaten Defendant, no weapons were drawn, and no harsh language was used. Defendant had largely unrestrained freedom of movement during the noncustodial questioning and acquiesced to answering questions. Defendant was even told that he could refuse both to answer questions and consent to search when such admonitions were not required.

Accordingly, I **FIND** no support for Defendant's claim of coercion or involuntary waiver, consent or confession.

### 3. Scope of Consent

Turning to the issue of whether the officers' search exceeded the scope of Defendant's valid consent, the "Waiver to Search Residence" signed by Defendant authorized the officers to "conduct a complete search of my residence located at 410 Thacker Lane Etowah, TN." [Government's Exhibit 2]. Although I have determined Defendant's consent was valid, the Court must still decide if the officers exceeded the scope of his consent when they searched the camper and truck parked on Defendant's property. Just as the Supreme Court in *Jimeno* considered "whether it is reasonable for an officer to consider a suspect's general consent to a search of his car to include consent to examine a paper bag lying on the floor of the car," 500 U.S. at 250-51, this Court must determine whether it was reasonable for the officers to have considered Defendant's consent to search his residence to include consent to search the camper and truck.[9]

Defendant argues the consent form should be read as limiting the search to his "residence"

---

[9] The *Jimeno* scope of consent analysis applies to a residence. *See United States v. Lucas*, 640 F.3d 168, 177-78 (6th Cir. 2011).

meaning his house only.  The Government argues the form authorized a "complete search" of the "premises" at the given address.  Both arguments have some merit.  Tellingly, however, no evidence was presented that Defendant ever once asked the officers to leave or protested that they were acting outside the scope of his consent.  Instead, Defendant actively cooperated during the entire search and interview according to the credible testimony of Agent Freeman.  This cooperation and his complete failure to object in any way demonstrates the search of the camper and truck were either explicitly or implicitly within the scope of his consent.

In any scope of consent question, the "scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251 (citation omitted).  The waiver form gives the officers permission to take from Defendant's "premises any letters, papers, materials or other property which they may desire." [Government's Exhibit 2].  It is hard to imagine a more expansive object of the search and Defendant was well aware the officers were searching for evidence of drug trafficking.  Defendant cannot reasonably contend that the officers had no reasonable basis to believe evidence of drug trafficking might be found in the camper and truck parked at his property under the circumstances.

The only argument Defendant has made is that the consent form itself limited the officers to searching the rooms within his house.  To the contrary, I **CONCLUDE** the officers reasonably understood the consent to include the outbuildings and parked camper and truck located at the property given Defendant's complete failure to object that the officers were going beyond the scope of his consent.  *See e.g., Jimeno,* 500 U.S. at 251; *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 547 (6th Cir. 2003) (holding a search is valid "as long as an officer has an objectively reasonable belief that the search was within the course of consent."); *Lucas*, 640 F.3d at 178 (holding consent to search a computer was implied because the defendant did not object

when an officer searched the computer files); *United States v. Sanchez*, 608 F.3d 685, 691-92 (10th Cir. 2010) (the scope of consent was not exceeded because the defendant's daughter consented to a search of whole house and did not object when officers searched the garage).

Given this conclusion, it is not necessary to address the Government's alternative argument regarding inevitable discovery. As argued by the Government, however, even if evidence is initially obtained improperly, it may still be admissible if it would have been inevitably discovered through lawful independent means. *Murray v. United States*, 487 U.S. 533, 539 (1988); *United States v. Hodge*, 714 F.3d 380, 388 (6th Cir. 2013). Such is the case here. Had Defendant attempted to limit or revoke his consent, a parole search could have been conducted, especially since Defendant had already admitted to having a methamphetamine pipe and abusing drugs in violation of his parole. Thus, the items discovered in the camper and truck pursuant to the consent would have been found even if the consent form is determined to limit the search to the rooms in Defendant's house.

### C. The February 5, 2015 Statement

The undisputed evidence demonstrates Defendant was not subjected to custodial interrogation at the time he made his second confession. The second interview, which took place at a public restaurant, was initiated by Defendant. Even if Agent Freeman manipulated Defendant into initiating contact as Defendant seems to suggest without any proof, Defendant suggested the restaurant as one of two possible meeting locations, Defendant drove himself to the interview, and Defendant selected a seat at the end of the table where he was free to leave anytime. Indeed, when the interview was over, Defendant provided a phone number to Agent Freeman and then drove away in his own vehicle. As argued by the Government, nothing about this encounter even remotely suggests it was a custodial interrogation that would trigger a

*Miranda* warning requirement.

Likewise there is no evidence of police coercion or intoxication sufficient to overwhelm Defendant's free will for the same reasons noted above. That Defendant may have driven off the road later that day does not indicate his confession—again which he claims was purposely false—was involuntary. *See e.g., Perry*, 703 F.3d at 910.

Accordingly, I **CONCLUDE** the evidence does not indicate either police coercion or that Defendant was too intoxicated to make a knowing, intelligent, and voluntary confession during his second interview.

### D. The September 9, 2015 Statement

The post-arrest interview of, and confession by, Defendant was clearly a custodial interrogation. As such, *Miranda* was triggered. The evidence clearly demonstrates Defendant was advised of his rights both orally and in writing, and that he waived those rights by signing the waiver form acknowledging he was speaking with the agents voluntarily and in the absence of any coercion. Accordingly, I **FIND** that Defendant's third statement was voluntary. *See e.g., United States v. Miller*, 48 F. App'x 933, 952 (6th Cir. 2002) (finding that a statement was voluntary despite the fact defendant was handcuffed and surrounded by police officers). For the reasons noted above, I do not find any coercive conduct by the officers and do not find Defendant was too high to give a voluntary statement. Even if Defendant fell asleep soon after the interview and although he tested positive for cocaine and methamphetamine in his system that day, the Government has met its burden of proving by a preponderance of the evidence that the third statement, like the two prior statements, was voluntary, knowing and intelligent. *See e.g., Perry*, 703 F.3d at 909 (holding consent was voluntary despite fact that defendant "was

handcuffed when she gave it, that the police were armed, that the police never told her that she could decline to consent, and that she was drunk at the time.").

Accordingly, I **CONCLUDE** the evidence does not indicate either police coercion or that Defendant was too intoxicated to make a knowing, intelligent, and voluntary confession during his third interview.

## III.    CONCLUSION

For the reasons stated above, I **RECOMMEND**[10] that Defendant's motion to suppress [Doc. 139] be **DENIED** in its entirety.

s/ *Susan K. Lee*

SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[10] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party.   Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure.   Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).   The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general.   *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).   Only specific objections are reserved for appellate review.   *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).